

THOMAS J. CATLIOTA
U.S. BANKRUPTCY JUDGE

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MARYLAND
### at Greenbelt

| | | |
|---|---|---|
| In re: | * | Case No.   18-23882-TJC |
| Redox Power Systems, LLC | * | Chapter   11 |
| Debtor | * | |

\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*

## <u>MEMORANDUM OF DECISION</u>

Debtor Redox Power Systems, LLC, seeks confirmation of its chapter 11 plan.  The plan presents a straightforward capital structure and simple reorganization scheme.  The debtor has no prepetition secured claims.  As pertinent here, Class Three unsecured creditors will be paid 20% of their claims unless they choose to accept a pro rata share of the reorganized debtor's equity.  Class Three has accepted the plan.  Class Four are the equity interests, which are eliminated under the plan.  Class Four has not accepted the plan.  The plan is funded by Rich Clay, who will make a capital contribution to the reorganized debtor of $1,960,000.  He will own the equity interests in the reorganized debtor along with those Class Three claimants who choose to convert their debt to equity.

Warren Citrin and Robert Thurber object to the plan.  They each hold unsecured claims of $126,470, and together contributed $4,100,000 of equity to the debtor prior to 2015.  They have been involved in, by their own characterization, "never ending" litigation with the debtor

1

for years.  Mr. Citrin and Mr. Thurber raise five objections to the plan.  They contend the filing of the plan was not authorized in accordance with Maryland law, and therefore fails to meet the requirements of 11 U.S.C. §1129(a)(2).  They also contend the plan was not filed in good faith as required by §1129(a)(3), fails to meet the best interest of creditors test as required by §1129(a)(7), and is not feasible as required by §1129(a)(11).  They contend the plan is not fair and equitable to Class Four, and therefore the plan cannot be crammed down under §1129(b)(2).[1] Finally, Mr. Citrin argues that his proposal to acquire the debtor made over the course of the four-day confirmation hearing should be accepted because it provides a better recovery to creditors than the plan.

The court concludes that the debtor has met the requirements for confirmation of the plan, and overrules the objections to confirmation raised by Mr. Citrin and Mr. Thurber.  The court also concludes that Mr. Citrin's proposal is subject to conditions that render it too speculative to be selected over the certainty of the plan.

The court has jurisdiction over this matter pursuant to 28 U.S.C. §§1334 and 157(a).  The court has authority to enter a final judgment under 28 U.S.C. §§157(b)(2)(L) and consistent with the standards of *Stern v. Marshall*, 564 U.S. 1058 (2011).

**Findings of Fact**

On October 19, 2018, the debtor filed for Chapter 11 relief.  Since then, the debtor has continued in possession of its assets and the management of its business as debtor-in-possession pursuant to 11 U.S.C. §§1107 and 1108.  The debtor was created in 2012 by its five founding members, Mr. Citrin, Mr. Thurber, David Buscher, Dr. Eric Wachsman and Dr. Bryan Blackburn.  Since its inception, the debtor has been in the process of developing (with the ultimate goal of marketing) technology related to low temperature oxide fuel cells.

---

[1] Unless otherwise noted, all statutory references herein are to the Bankruptcy Code, 11 U.S.C. §101, *et seq.*, as currently in effect.

**The Debtor's Plan and Financial Resources**.

For reasons that shall become apparent, the debtor filed its reorganization plan and disclosure statement on the petition date (ECF 11 and 12) and sought a confirmation hearing no later than December 2018.  The amended plan (ECF 221) groups the claims and interests into four classes:  Class One consists of priority claims, of which there are none.  Class Two is the debtor-in-possession loan made by Mr. Clay (the "DIP Loan").  Under the plan, the DIP Loan is either paid in full or Mr. Clay can elect to convert it to equity in the reorganized debtor.  Class Three consists of general unsecured claims.  Class Three general unsecured creditors will be paid 20% of their claims on the first anniversary of the effective date unless they choose to accept a pro rata share of the reorganized debtor's equity.  All noninsider unsecured creditors who voted have accepted the plan, other than Mr. Citrin and Mr. Thurber.  Class Four consists of the equity interests; they are eliminated under the plan.  Three equity holders, who also were among the five founding members, Mr. Citrin, Mr. Thurber and Dr. Wachsman, voted against the plan.

Mr. Clay, individually or through Orbis Non Sufficit, LP ("Orbis")—an entity he owns— has three claims against the debtor: (1) the DIP Loan with an outstanding balance of $473,626; (2) a prepetition Class Three claim of $416,975.48; and (3) a prepetition Class Three claim of $2,125,000 held by Orbis.  He has elected to take equity in exchange for all three claims.  Four other Class Three creditors elected to convert their claims to equity: Mr. Buscher ($629,998.21)[2]; Kelly-Dorsey, PA ($235,075.69); the University of Maryland ($594,604.28) and Mr. Citrin ($126,470.74).  Debtor's Ex. ("DX") 8 at 2.  Thus, the equity in the reorganized debtor will be held by Mr. Clay, Orbis, and the creditors who chose equity rather than the 20% payout.

In addition, Mr. Clay will provide a $1,960,000 capital contribution to the reorganized

---

[2] Mr. Buscher is the debtor's Chief Operating Officer.  Mr. Citrin and Mr. Thurber filed an objection to this claim and that will need to be resolved.  Mr. Buscher also has filed a claim in the amount of $20,770.78, for which no objection has been filed.  He chose the 20% payment for this claim.

debtor on the plan's effective date. For that contribution, he will receive no additional equity percentage in the reorganized debtor than he will receive under the plan based on the pro rata conversion of the claims to equity. The $1,960,000 capital contribution will be used to pay administrative claims, the unsecured creditors who will be paid 20% of their claims, other costs, and the balance will be used for working capital going forward.

The debtor has no products that function or are available to sell or license to customers. Rather, its source of revenue is from cooperative agreements with the U.S. government, primarily if not exclusively, the Department of Energy. The government provides funds for the continued development of the debtor's technology based on a percentage reimbursement agreement. The debtor submits reports on its work and the government reimburses the debtor for the appropriate percentage of the costs, depending on the particular agreement. The debtor must fund the expenses not covered by the agreement. As described further in the discussion of the best interest of creditors test, the debtor is approximately a year away from having a raw prototype it can demonstrate to customers.

From the beginning of this case, the debtor's ability to remain a going concern past February or March 2019 has been in serious doubt. Early in the case, the debtor obtained the DIP Loan from Mr. Clay pursuant to a motion for post-petition debtor-in-possession financing. *See* ECF 6. The debtor established it would not be able to remain viable but for the DIP Loan, which was expected to carry the debtor only through about February or March 2019. Mr. Clay was willing to provide the DIP Loan because the debtor's plan allows him to gain control of the debtor. He would not have provided the DIP Loan unless that was the case. If the plan is not confirmed, he will provide no further interim financing and will withdraw his offer to provide additional capital.

The debtor's lack of cash resources was also the subject of testimony by its Chief

Executive Officer, Craig Dye, which the court accepted, at a hearing on January 11, 2019.  Mr.

Dye again testified at the confirmation hearing on this subject, and did so at some length.  He

established that the debtor has been able to continue operations only because of the DIP Loan,

and had made a request to draw the last available funds prior to the hearing.  Currently, the

debtor has the ability barely to meet its March 6 payroll and likely will run out of cash once

current obligations are paid.

For this reason, the debtor filed its plan and disclosure statement on the petition date.  It

sought a confirmation hearing at the earliest available date in December 2018.  Mr. Citrin and

Mr. Thurber objected to that timetable, arguing it deprived them of the ability to prepare their

objection to the plan.  To accommodate Mr. Citrin and Mr. Thurber's request for time to prepare

their objection, the court put off the confirmation to the latest date that the hearing could be held

consistent with the debtor's cash resources.  The confirmation hearing was held February 19, 22,

25, and 26, 2019.  The University of Maryland and Mr. Citrin and Mr. Thurber filed post-hearing

briefs on February 27 and March 1, and the matter is ripe for resolution.

**The Prepetition Litigation Between the Parties.**

There has been a five-year history of litigation between the debtor and certain directors,

on the one hand, and Mr. Citrin and Mr. Thurber, on the other, involving four lawsuits in state

court.  As appears to this court, the disputes stem from the consequences of the debtor's inability

to develop successfully its technology.  In 2014, after contributing $4.1 million to the debtor, Mr.

Citrin and Mr. Thurber determined they would not provide additional funds unless they were

given 51% of the voting rights of the company.  DX 24.  The other members of the Board

refused that request.  There followed lawsuits and disputed corporate actions that continue to this

day.  To the extent the state court litigation is relevant to the issues before this court, it will be

addressed below.

5

**Mr. Clay's and Orbis's Transactions with the Debtor.**

Between March and November 2014, Mr. Clay made four loans to the debtor totaling $375,000, with a current balance of $416,975.48 (the "Clay 2014 Loans"). Mr. Citrin and Mr. Thurber's Ex. ("C/T EX") 8. The Clay 2014 Loans are evidenced by promissory notes bearing interest at 4%, with an open-ended term payable upon the occurrence of various events. *Id*. The notes contain a nonwaiver provision. No payment has been made on the Clay 2014 Loans.

In March 2017, Mr. Clay, acting through Orbis, entered into a Series A Convertible Preferred Units Purchase Agreement (the "Preferred Agreement"). C/T EX 7. The Preferred Agreement provided that Orbis would acquire $5,000,100 of convertible preferred units in the debtor by September 20, 2018. *Id*. at ¶¶ 1.1, 1.3, and Ex. A thereto.

In one of the lawsuits between the debtor and Mr. Citrin and Mr. Thurber, the Circuit Court of Howard County, Maryland, ruled in February 2018 that Mr. Citrin and Mr. Thurber had been improperly removed from the Board in 2016. This ruling is addressed further below in the discussion of the debtor's authority to file the plan. As it affected Orbis's investment, the debtor determined, based on the ruling, that it had not obtained the necessary Board approval to enter into the Preferred Agreement. As of that time, Orbis had advanced approximately $2.1 million under the Preferred Agreement. The debtor and Mr. Clay agreed that the $2.1 million should be treated as debt in light of the ruling. The debtor's books and records were amended to reflect that Mr. Clay and Orbis held $2.1 million in debt rather than as preferred equity (the "$2.1 Million Converted Debt"). This was shown on the debtor's tax filings as well. In light of these events, Mr. Clay determined that he would not advance additional funds under the Preferred Agreement.

Both the debtor and Mr. Clay understand the Preferred Agreement to give Mr. Clay the right to be on the Board. They also agree, however, that he never became a member of the

Board.  He has never participated in a Board meeting, nor has he been engaged in the debtor's management decisions.[3]

<b>Conclusions of Law</b>

The debtor, as plan proponent, bears the burden of proof of establishing that the requirements for confirmation contained in §1129(a) are met.  The debtor has met its burden. The court below addresses those requirements that are most in dispute.

**Section 1129(a)(2) – Corporate Authority to File the Plan.**

Mr. Citrin and Mr. Thurber contend that the filing of the plan was not authorized under Maryland law or the debtor's Amended and Restated Operating Agreement, dated May 31, 2012 (the "Operating Agreement").  They contend, therefore, the debtor cannot establish that the plan meets the requirements of §1129(a)(2).  The court disagrees.

In one of the lawsuits between the parties in the Circuit Court for Howard County Maryland, *Redox Power Systems, LLC v. Warren Citrin, et al.*, Case No. 13-C-16-110031, the debtor maintained it had removed Mr. Citrin and Mr. Thurber from the Board by a resolution of the other three Board members in 2016.  In February 2018, the Circuit Court ruled that "the Board of Directors does not have authority to terminate or remove Directors without amending the Operating Agreement in accordance with the provisions of the Operating Agreement and Maryland law, which amendment has not been accomplished as of the date of this Order." C/T EX 33.

In response to the ruling, the debtor, after consulting with counsel, took steps to amend the Operating Agreement in order to remove Mr. Citrin and Mr. Thurber as members of the Board.  On or about April 20, 2018, Dr. Wachsman, Dr. Blackburn and Mr. Buscher, as members

---

[3] At the first day hearings in this case on October 24, 2018, it was established through the debtor's testimony that Mr. Clay has not been involved in management decisions of the debtor.  There was no evidence to the contrary at the confirmation hearing.

of the Board, executed the Third Amendment to the Amended and Restated Operating

Agreement of Redox Power Systems, LLC (the "Third Amendment").  DX 4.  Among other

things, the Third Amendment reduced the number of directors from five to three and identified

the three signers as the directors.  On or about that date, they also executed Board of Directors

Resolution 2018-001 (the "April 2018 Resolution").  DX 5.  The April 2018 Resolution again

named Dr. Wachsman, Dr. Blackburn, and Mr. Buscher as the three Board members and ratified

their past actions.

Mr. Citrin and Mr. Thurber were not notified of these actions until July 5, 2018.  They

challenged these actions by the Board and, when unsatisfied with the response, filed a new

complaint in the Circuit Court.[4]  When this bankruptcy case was filed, they did not challenge the

Board's authority to file the petition, but they now challenge the Board's authority to file the

plan.[5]

The court turns to the operative documents.  The Operating Agreement appointed the five

founding members to the Board.  C/T EX 1 at §6.3.  Section 10.1 governs the requirements for

its amendment:

> Section 10.1 Amendment by Board of Directors.    This  Agreement   may   be
> amended solely by the Board of Directors in accordance with Section 6.1.  At the
> option of the Board of Directors, any amendment made pursuant to this Section
> 10.1, to the extent possible, may be made effective as of the date of this
> Agreement.  Notwithstanding the foregoing, any amendment to this Agreement
> that materially adversely affects any Interest Holder's economic interest in the
> Company shall require the consent of such Interest Holder.

*Id*. at §10.1.  Section 6.1 sets forth the matters that must be approved by the Board and the

---

[4] The lawsuit was stayed as a result of the bankruptcy filing.

[5] Counsel for Mr. Clay argues that Mr. Citrin and Mr. Thurber should be estopped to challenge the Board's authority
to file a plan because they did not challenge its authority to file the bankruptcy case.  In light of the court's ruling,
the court need not address this point.  But it is of no small concern that Mr. Citrin and Mr. Thurber allowed the
case to proceed for four months, have the debtor draw down the entirety of the DIP Loan, and get to the point of
administrative insolvency before they brought the question of the Board's authority for resolution before the court.

8

pertinent provisions in the Operating Agreement for obtaining approval:

> Section 6.1 <u>Management by Board of Directors</u>.
>
> ******
>
> Notwithstanding such designation of Officers or other Persons, except as otherwise specifically provided in this Agreement, or as expressly set forth in any resolution adopted with the approval of the Board, the following actions shall require the affirmative approval of the Board of Directors as and in the matter specified in Section 6.4 and Section 6.5 hereof:
>
> ******
>
> (iv)    amendment of the Articles or this Agreement;

*Id.* at §6.1.  Thus, pursuant to §6.1, amendments to the Operating Agreement must be made in accordance with §6.4 and §6.5.  Section 6.4 provides:

> Section 6.4 <u>Voting of Directors</u>.    Except as otherwise expressly provided in this Agreement, (i) each Director shall have one (1) vote on any matter voted on by the Board of Directors and (ii) any action to be taken by the Board of Directors shall require the approval, in person or by proxy, of a majority of the votes that may be cast by the Founder Directors.  Each Director may appoint a designee, which may be another Director, to serve in his place on the Board of Directors at any time or from time to time in his sole discretion.  In the event a Director designates another Director to serve in his place, such Director shall be counted as two (2) Directors toward a quorum, and shall be counted as two (2) votes in any matter voted on or approved by the Board of Directors.  In the event a Founder ("Transferring Founder") transfers all of his Shares to another Founder ("Receiving Founder"), the Receiving Founder shall be counted as two (2) Directors toward a quorum, and shall be counted as two (2) votes in any matter voted on or approved by the Board of Directors.

*Id.* at §6.4.  Section 6.5(ii) provides:

> Section 6.5.  Approval of Actions.  Each matter to be decided by the Board of Directors in accordance with this Agreement shall be approved by (i) a vote of the Directors at a meeting; (ii) written consent of the Directors; and (iii) individual polling of Directors, as follows:
>
> ******
>
> (ii) <u>Written Consent</u>.  Any action of the Board of Directors may be taken without a meeting if a consent, in writing, authorizing the action, shall be signed by Directors authorized to cast the number of votes required to approve such action.

*Id.* at §6.5.

The Third Amendment was adopted in accordance with the Operating Agreement and Maryland law.  The Maryland Limited Liability Company Act requires that an operating agreement that provides the manner in which it is to be amended must be amended in accordance with its provisions.  Md. Code Ann., Corps. & Ass'ns §4A-402(c)(2) (2018).  Here, §10.1 requires that any amendment to the Operating Agreement must be approved by the Board in accordance with the procedures of §6.1.  That section, in turn, requires that the debtor comply with §6.4 and §6.5.  Section 6.4 requires a majority vote by the Board on any matter.  Section 6.5(ii) allows "any action" to be taken by the Board without a meeting upon approval in a signed writing from "Directors authorized to cast the number of votes required to approve such action." C/T EX 1 at §6.5.  The Third Amendment was signed by three directors, which are the number of directors required to approve an amendment to the Operating Agreement.  Therefore, the Third Amendment was properly authorized.

Mr. Citrin and Mr. Thurber contend the Third Amendment violated the requirement in §10.1 that "any amendment to this Agreement that materially adversely affects any Interest Holder's economic interest in the Company shall require the consent of such Interest Holder." *Id.* at §10.1.  The Limited Liability Company Act defines "economic interest" as "the member's share of the profits and losses of a limited liability company and the right to receive distributions for the limited liability company."  Md. Code Ann., Corps. & Ass'ns §4A-101(i).  The reduction in the number of directors does not materially adversely affect a member's share of profits and losses or the right to receive distributions.

Mr. Citrin and Mr. Thurber also contend the Third Amendment is invalid because its provisions were improperly made retroactive to the effective date of the Operating Agreement. Section 10.1 provides that "any amendment made pursuant to this Section 10.1, to the extent

possible, may be made effective as of the date of this Agreement."  C/T EX 1 at §10.1.  While it is true that retroactively changing the number of Board members from five to three would not seem to meet the requirements of "to the extent possible," the Operating Agreement contains a severability provision:

> Section 12.5 <u>Severability of Provisions</u>.      If any provision of this Agreement, or the application thereof to any Person or circumstance, shall, for any reason and to any extent, be invalid or unenforceable, the remainder of this Agreement and the application of that provision to other Persons or circumstances shall not be affected but rather shall be enforced to the extent permitted by law.

*Id.* at §12.5.  While the application of the reduction in the number of Board members may be invalid for the period preceding the date of the Third Amendment, the application of that provision from and after the Third Amendment is not.[6]

The court concludes that the Third Amendment was made in accordance with Maryland law and the Operating Agreement.  Therefore, the bankruptcy case was properly authorized by a unanimous resolution of the Board.  Further, despite a misunderstanding between Mr. Dye and Dr. Wachsman over whether Dr. Wachsman had only agreed to the bankruptcy filing and not filing the plan, the filed plan was approved by a majority of the Board and therefore was authorized by the Third Amendment.

**Section 1129(a)(3) – Good Faith.**

Mr. Citrin and Mr. Thurber contend that the plan was filed in bad faith because its primary purposes is to eliminate their equity interests and it treats the Clay 2014 Loans and the $2.1 Million Converted Debt as debt without challenging alleged infirmities in those claims. These contentions are unavailing.

---

[6] Mr. Citrin and Mr. Thurber contend the Third Amendment is ineffective because the debtor did not send them a copy of it as required by Md. Code Ann., Corps. & Ass'ns §4A-402(c)(4).  The evidence established, however, that they were sent a copy no later than July 5, 2018.  While the delay in issuing the notice is unfortunate, §4A-402(c)(4) does not contain a time requirement for providing notice.  Further, the delay was not prejudicial.

Mr. Dye testified on two occasions in this case, most recently at the confirmation hearing. On both occasions, the court found him to be thoughtful, careful and credible. He is not one of the five founding members and joined the debtor after much of the litigation and disputes between them occurred. He is most concerned with maximizing recovery to creditors and attaining a successful development of the debtor's technology. He established that the debtor filed this case because it lacked the resources to pay its obligations, and it needed the DIP Loan to remain in operation until it could confirm a plan that would allow it to receive the capital contribution from Mr. Clay. This has proven to be the case. He also testified that from the beginning of the case, Mr. Clay was committed to providing post-confirmation capital to the debtor, although the specific amount of that contribution was not determined until the debtor finalized its cash flow projections.

Further, all equity holders are treated the same under the plan. This includes the equity held by Dr. Blackburn and Mr. Buscher, two of the founding five members who sit on the Board. They are treated exactly the same as the other equity members, including Mr. Citrin and Mr. Thurber. The equity is eliminated because it has no value, to a very substantial degree.

Next, Mr. Citrin and Mr. Thurber contend that the Clay 2014 Loans and the $2.1 Million Converted Debt should not be entitled to the same rights under the plan as the other unsecured creditors. They assert: (1) the Clay 2014 Loans and the $2.1 Million Converted Debt should be re-characterized as equity under the standards in *In re Official Comm. of Unsecured Creditors for Dornier Aviation (North America), Inc.*, 453 F.3d 225 (4th Cir. 2006); (2) the $2.1 Million Converted Debt should be subordinated under §510(b), behind the claims of other unsecured creditors; and (3) the $2.1 Million Converted Debt constitutes a fraudulent conveyance under §548(a)(1) and should be avoided.

These contentions were the subject of a motion by Mr. Citrin and Mr. Thurber for derivative standing to bring these claims against Mr. Clay and Orbis.  The court denied the motion stating:

> Here, the Debtor has determined, in its business judgment, that creditors and the estate are better off pursuing a plan of reorganization with resources provided by Mr. Clay than they would be pursuing the claims against Mr. Clay, as asserted by Mr. Citrin and Mr. Thurber. The Debtor contends that the claims against Mr. Clay and Orbis have no merit and would be a waste of resources to pursue. The Debtor also contends that, whatever the merit of the claims, pursuing the claims would lead to certain liquidation. No one seriously disputes that if the Debtor pursues the claims against Mr. Clay, the plan would fail because Mr. Clay would have no interest in funding a plan while being the subject of litigation. Mr. Citrin and Mr. Thurber argue that would be a good thing for the creditors. They contend creditors are better off though liquidation than they are under the plan because the liquidation value of the Debtor exceeds the value creditors will receive under the plan.

> Essentially, then, creditors are given the choice under the plan to either side with the Debtor's view of the case and vote for confirmation, or side with Mr. Citrin and Mr. Thurber and vote against the plan and pursue liquidation. As instructed by the court, the Debtor has supplemented its disclosure to creditors so that they are advised of these differing views.  ECF 146.  The Debtor's determination to seek reorganization rather than pursue a path that would undoubtedly lead to liquidation is not unreasonable.

> This is especially true considering that the claims against Mr. Clay and Orbis would not add any value to the Debtor if successful. The claims seek no affirmative relief and would not recover assets for the benefit of the estate. The claims merely seek to rearrange the claims and equity interests against the Debtor. To be sure, creditors would be better off in a liquidation if the claims are successful simply because there would be less creditor claims to share in any recovery. But the claims provide no added value to the Debtor.

> Finally, merely allowing Mr. Citrin and Mr. Thurber to bring the claims would result in the liquidation of the Debtor, whether or not the claims are successful. The Debtor simply has no ability to remain a viable going concern during the period it would take to resolve the claims.

> For the forgoing reasons, the court concludes the Debtor was justified in denying the request by Mr. Citrin and Mr. Thurber to bring the claims against Mr. Clay and Orbis.

ECF 199 at 7-8. At the confirmation hearing, the debtor again established through testimony that the foregoing is an accurate assessment of the debtor's rationale in pursuing a plan funded by Mr. Clay rather than bringing claims against him and Orbis. Mr. Citrin and Mr. Thurber's contention that this rationale evidences bad faith is unconvincing.

The Bankruptcy Code does not require a debtor to bring every potential claim it may have against every potential litigant. Section 1123(b)(3)(A) expressly allows a plan to provide for the "settlement or adjustment of any claim or interest belonging to the debtor or the estate." Here, the debtor, in its business judgment, did not pursue the recharacterization and avoidance claims against Mr. Clay and Orbis for the reasons stated above. The debtor disclosed to the parties entitled to vote on the plan the existence of these claims, its reasons for not bringing the claims, and its judgment on the benefits to creditors and the estate of going forward with a plan funded by Mr. Clay rather than suing him. ECF 146. All non-insider creditors who voted did so in favor of the plan. This is an appropriate resolution under §1123(b)(3)(A).

Finally, under the plan, the capital structure of the reorganized debtor essentially renders Mr. Citrin and Mr. Thurber's contentions completely academic. As stated above, Mr. Clay will contribute $1,960,000 of capital to the reorganized debtor but receive no additional equity interest than he would obtain as a result of the debt-to-equity election in the plan. In essence, the plan gives him no credit for the 2014 Loans and the $2.1 Million Converted Debt. This is because if those claims were recharacterized as equity or avoided and excluded from Class Three, as Mr. Citrin and Mr. Thurber contend, Mr. Clay would still receive approximately the same equity percentage on account of his $1,960,000 capital contribution as he would under the plan election. The plan, therefore, has the effect of resolving the recharacterization and avoidance claims in favor of the estate.

Mr. Citrin and Mr. Thurber's contention that the Clay 2014 Loans and the $2.1 Million Converted Debt should be recharacterized or avoided is at the center of many of their objections to the plan.  The court above determines that the plan provides an appropriate resolution of those claims, and also that Mr. Clay's post-confirmation capital contribution essentially renders these contentions academic.  Nevertheless, the court will address two pertinent issues in the case *as if* the Clay 2014 Loans and the $2.1 Million Converted Debt were recharacterized from debt to equity.  Thus, the court addresses below whether the plan meets the best interest of creditors test of §1129(a)(7) even if the Clay 2014 Loans and the $2.1 Million Converted Debt are initially excluded from any distribution to general unsecured creditors in a chapter 7 liquidation.  The court also determines whether the plan was accepted by Class Three without regard to the votes of Mr. Clay and Orbis, thereby meeting the requirements of §1129(a)(8).  The court does not do so in response to Mr. Citrin and Mr. Thurber's bad faith challenge, or even in response to their allegations of the merits of these claims, but only to determine, under the exigent circumstances of this case, that the plan meets these requirements of §§1129(a)(7) and (a)(8) even if giving full effect to Mr. Citrin and Mr. Thurber's claims.

**Section §1129(a)(7) - Best Interest of Creditors Test.**

Section 1129(a)(7) provides, in pertinent part:

(a) The court shall confirm a plan only if all of the following requirements are met:

******

(7) With respect to each impaired class of claims or interests-- (A) each holder of a claim or interest of such class-- (i) has accepted the plan; or (ii) will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of this title on such date;

Section 1129(a)(7) operates on an individual creditor or interest holder level.  "It is an individual guaranty to each creditor or interest holder that it will receive at least as much in reorganization

as it would in liquidation."  7 Collier on Bankruptcy ¶1129.02[7] (Richard Levin & Henry J. Sommer eds., 16th ed.).  Under the provision, absent acceptance of the plan, "a creditor or interest holder must receive property that has a present value equal to that participant's hypothetical chapter 7 distribution if the debtor were liquidated instead of reorganized on the plan's effective date."  *Id*.

Under the plan, creditors receive a 20% payment on their claims, or they can choose a pro rata share of the debtor's equity.  Thus, creditors who elect to receive equity place greater value on the equity than they do a certain 20% cash payout.  Therefore, the court will use the 20% payout as the measure to determine if the creditors are receiving at least what they would receive in a chapter 7 liquidation.

The court will begin by determining the total claims that would be paid ahead of or on par with unsecured creditors in a chapter 7.  It will then determine the amount of the recovery available for distribution to those claims to determine whether the creditors would receive more or less than 20% in a liquidation.

The balance on the DIP Loan is $473,626.  DX 23.  The DIP Loan was secured by all assets of the debtor, with certain exceptions not pertinent here.  ECF 58 at ¶7.  In any liquidation of the debtor's assets, the DIP Loan must be paid before unsecured creditors.  *Id.* at ¶4.

The chapter 7 trustee receives a commission for services based on the graduated schedule of §326(a).  For reasons stated below, the court estimates that the distribution in a chapter 7 would not exceed $750,000, and therefore the trustee's fee would be no more than $40,000.

Next paid would be the administrative claims of the chapter 7 case.  *See* §726(a)(1).  This would include attorney fees, auctioneer fees and the like.  The court very conservatively estimates these costs to be $25,000 based on the assumption that a chapter 7 trustee would

16

conduct a straightforward liquidation sale of the various assets of the debtor without engaging in litigation or substantial disputes.

Next comes the administrative claims from the chapter 11 case, which are paid ahead of the Class Three claims in a chapter 7 liquidation.  §348(d).  These are estimated to be $281,276. DX 14 at 2.

The court turns to the amount of the Class Three claims that would share in the distribution under chapter 7.  Class Three claims total $4,584,531.64.  DX 8.  As previously stated, Mr. Citrin and Mr. Thurber have objected to the $629,998.21 claim of Mr. Buscher and contend that the Clay 2014 Loans ($416,975.48) and the $2.1 Million Converted Debt ($2,125,000) are subject to being recharacterized as equity or avoided.  They argue, therefore, that these three claims would not share in a chapter 7 distribution thus increasing the distribution to the other Class Three claimants.  For purposes of this analysis, the court will initially remove these three claims from Class Three.  If the plan meets the best interest of creditors test assuming no distribution to these three claims, then Mr. Citrin and Mr. Thurber's challenges to these claims become entirely academic.

Removing the claims of Mr. Buscher, Mr. Clay and Orbis from $4,584,531.64 leaves $1,412,557.95 of Class Three claims ($4,584,531.64 - $629,998.21 - $416,975.48 - $2,125,000). A 20% distribution to these Class Three claims would be $282,511.59.

In sum, the following shows the claims that must be paid in a chapter 7 liquidation before payment to the Class Three claims and the value received by Class Three creditors under the plan:

| | |
|---|---|
| DIP Loan | $473,626 |
| Chapter 7 Trustee's Commission | $ 40,000 |
| Chapter 7 Administrative Professional Claims | $ 25,000 |

| | |
|---|---|
| Chapter 11 Administrative Claims | $281,276 |
| Total Claims paid ahead of Class Three Claims | $819,902 |
| Value Received by the Class Three Claims under the plan (excluding Mr. Buscher, Mr. Clay and Orbis) | $282,511 |
| Total | $1,102,413 |

The foregoing establishes that a chapter 7 liquidation must generate $819,902 before any amount would be paid to Class Three creditors in a liquidation. A liquidation would then need to generate an additional $282,511 before Class Three creditors could potentially receive more than they would receive under the plan, without considering the claims of Mr. Buscher, Mr. Clay and Orbis. Only if that amount is met would the court need to address Mr. Citrin and Mr. Thurber's objection to the claims.

The court now turns to the value the Class Three creditors would receive in a chapter 7 liquidation.

The debtor lists 29 items of personal property on Schedule A/B with a depreciated value of $113,338. ECF 79 at 11. The items include a microscope, printer, laptop, macroscopes, and the like. These are the types of personal property that, in the court's experience, usually generate cents on the dollar of original cost in a chapter 7 sale. Nevertheless, again to be conservative, the court estimates net recovery to be $100,000 from these assets.

The court turns to the debtor's technology. The debtor has no working product and is approximately 12 months away from producing a raw, working prototype that functions sufficiently to make a demonstration to potential customers. The debtor's technology is described as being in the "know how" state, meaning it is largely in the collective understanding of management and employees. The technology is, at best, contained in notebooks that contain the notes of employees over the past seven years. The notebooks are of limited utility. Dr. Blackburn, the debtor's Chief Technology Officer, testified credibly that he needed to go back

and recreate an action from several years ago and it took him four months to sort it out through the notebooks—and he drafted many of the notebooks.  This is one reason Mr. Dye testified that, in early stage technology companies, investors often "invest in the jockey, not the horse."  By that he meant that investors often place greater confidence in the management team's ability to move the development process to a successful completion than they do in the state of the technology.  A chapter 7 trustee would find it difficult, if not impossible, to capture any value from the "jockey" given the debtor has no employment contracts with management and considering the debtor's precarious financial condition and the state of its technology.

Further, the debtor is a party to a research agreement with the University of Maryland. The debtor has entered into a settlement agreement with the University that is an important element of the plan.  ECF 191.  The University of Maryland supports the plan and the settlement is subject to the plan being confirmed.  In the absence of confirmation, the parties' rights revert to whatever rights they have under the agreement.

The debtor also has various licenses with the University of Florida.  The licenses were not shown to have any independent value outside of whatever utility they provide in the operation of the debtor.  The University of Florida has entered into a settlement with the debtor, but whether these licenses could be assumed and assigned in a chapter 7 liquidation is uncertain.

A chapter 7 trustee's ability to assume these agreements and licenses, and assign them over the objection of the universities, is highly problematic. The University of Maryland for one, has made it clear it supports the plan but would vigorously object to the transfer of its agreement outside of the plan or in a chapter 7.  This point is addressed further in the discussion of Mr. Citrin's offer, below.

The court concludes the Class Three claims would receive nothing in a chapter 7 liquidation.  This conclusion is based on the state and type of the debtor's assets, especially the

state of its technology, the debtor's lack of financial resources, the uncertainty over the

university agreements, and the court's experience presiding over chapter 7 cases. The chapter 7

trustee would be well served to recover enough to pay the DIP Loan and the chapter 7

administrative claims. It is doubtful that the recovery would even contribute to the payment of

any portion of the Chapter 11 administrative claims

The court initially reaches this conclusion without regard to the expert opinions offered

by the parties. This conclusion, however, is fully supported by the opinion of the debtor's

expert, Neil Demchick, which the court accepts. Mr. Demchick has substantial experience in

valuations and liquidation proceedings in bankruptcy and is, among other certifications, a

Certified Insolvency and Restructuring Advisor and a Certified Distressed Business Valuator.

DX 9. He has served as a trustee, examiner, plan administrator and receiver in bankruptcy and

state court proceedings. *Id*. at 2. He understood the risks of liquidating assets in bankruptcy,

lease and contract rejection claims, and the overall liquidation process. In reaching his

conclusion, he employed the three usual methods of valuation. DX 10 at 16. After a careful and

lengthy analysis, he concluded the unsecured creditors would not receive any distribution in a

chapter 7 liquidation. *Id.* at 23-29.

Mr. Citrin and Mr. Thurber challenge Mr. Demchick's conclusions because he opined

that the actual recovery from the debtor's technology in a chapter 7 liquidation is speculative.

But given the nature of the debtor's assets and the status of its technology, it is true that any

specific determination of recovery from the liquidation of the debtor's technology is speculative.

To state otherwise would require the court to temper an opinion of value "when mathematical

exactitude conveys a false sense of precision." 7 Collier on Bankruptcy ¶1129.02[7][b][iii]

(citing *In re Affiliated Foods, Inc.,* 249 B.R. 770, 787-790 (Bankr. W.D. Mo. 2000)). What the

court views as entirely not speculative, however, is the conclusion that the liquidation would not yield to the Class Three claims more than they would receive under the plan.

Mr. Citrin and Mr. Thurber's expert's opinion was not at all helpful. He determined the current "enterprise value" of the debtor as of November 2018, which he reduced by 35% to account for a broker fee required to sell the debtor in a chapter 7 liquidation, and an additional 5% unspecified discount. He opined that a chapter 7 liquidation would generate $9.1 million. This opinion is fraught with problems.

Initially, the court rejects the opinion of current enterprise value as unsupported. The expert testified unequivocally, several times, that he reached this value by relying "100%" on the March 2017 Preferred Agreement transaction with Orbis. He calculated the "implied value" as of March 2017 to be $13.9 million. C/T EX 28 at 7. He made this calculation by determining what the value of the debtor was based on the number of shares and price contained in the Preferred Agreement. He essentially brought that value forward to conclude that the implied value was $13.9 million as of November 2018.

For reason stated below, the court determines that going concern value is not an appropriate measure of value to use in this case for the best interest test. Even if that were not the case, however, the court would not accept the $13.9 million "implied value" as current going concern value. It relies on a two-year-old transaction and does not adequately take into account the debtor's operations or the events that have transpired subsequent to that transaction. For example, Orbis did not fund the entire $5 million but only $2.1 million under the Preferred Agreement, at which point the transaction collapsed, and no additional funds were advanced. The expert opined that the collapse of that transaction was not relevant to his analysis because the pertinent point in time was March 2017 when the parties entered into the Preferred Agreement. The expert also did not properly take into account the change to the debtor's cash

21

flow and operations, or its failure to meet the projections that were applicable at that time. In the court's view, the March 2017 transaction is simply too stale, and too much has occurred in the operation of the debtor since that transaction, to use it "100%" to determine the current value of the debtor.

The expert then reduced the value implied by the March 2017 transaction by 35% to reach his perceived liquidation value. He applied this reduction because a broker that he called told him the broker fee to sell technology would be 30%. It was not shown that the broker had any knowledge of the debtor or chapter 7 liquidation procedures.

Mr. Citrin and Mr. Thurber's expert has no stated experience in bankruptcy or bankruptcy liquidation. He does not understand the chapter 7 liquidation process or the requirements for assuming and assigning contracts and licenses in bankruptcy. He did not articulate how a chapter 7 trustee could capture going concern value when the debtor's cash resources will run out before a chapter 7 sale could be conducted, or how the chapter 7 trustee could capture the value from the key employees or the current status of the technology. He could not provide any support for the position that, the difference between enterprise value and chapter 7 liquidation value is essentially the payment of a broker's fee. He had at best a rudimentary understanding of the debtor's assets. His reduction of the implied value by 35%, to take into account a 30% broker's fee and an unspecified 5% discount, did not present a credible analysis of chapter 7 liquidation value.[7]

A similar situation was faced by the court in *In re Lason, Inc.*, 300 B.R. 227 (Bankr. D. Del. 2003):

---

[7] When the expert reached his opinion, it was not known that Mr. Clay would contribute $1,960,000 which, along with whatever value is attributed to the heavily challenged Clay 2014 Loans and the $2.1 Million Converted Debt, would give Mr. Clay approximately 80% in the reorganized debtor. Nor was it known that Mr. Citrin's conditionally offered to pay $2.5 million for 100% of the debtor. Upon learning of these substantially lower amounts, his attempt to justify his $13.9 million enterprise value and $9.1 million liquidation value was unconvincing.

> [The] expert testified that selling the Debtors' business other than as a going concern was not in the best interest of creditors. However, he could not testify from any personal experience as to how the Debtors could have been sold as a going concern in chapter 7. He had no relevant chapter 7 liquidation experience to render a reliable opinion and had "never seen robust bidding in a chapter 7."
>
> As a result, we conclude that, while a liquidation analysis may include the sale of a company as a going concern by a chapter 7 trustee under sections 704(1) and 721, the sale of these Debtors' businesses as a going concern, because they are so firmly based on key employees and customers' good will, could not have been accomplished under chapter 7.

*In re Lason, Inc.*, 300 B.R. at 233-34.  Here, the court reaches a similar conclusion.  Given the uncertainties over the debtor's cash resources and the state of its technology, and considering the challenges to a chapter 7 sale presented by the debtor's agreement with the University of Maryland and perhaps the University of Florida, the court concludes that this is not an appropriate case to consider going concern value for the best interest of creditors test.

**Sections 1129(a)(8) and 1129(a)(10) – Plan Acceptance.**

Section 1129(a)(8) provides:

> (a) The court shall confirm a plan only if all of the following requirements are met:
> ******
>   (8) With respect to each class of claims or interests—
>     (A) such class has accepted the plan; or
>     (B) such class is not impaired under the plan.

Section 1129(a)(10) provides "If a class of claims is impaired under the plan, at least one class of claims that is impaired under the plan has accepted the plan, determined without including any acceptance of the plan by any insider."

Here, Class Three has accepted the plan, meeting the requirements of §1129(a)(8) for that class.  ECF 193 at 1, 2.  *See* §1126(c) (Acceptance of plan by a class of claims requires acceptance by creditors holding at least two-thirds in amount and more than one-half in number of the creditors in the class that voted.).  Further, Class Three is impaired and has accepted the

plan without regard to the votes of Mr. Buscher or Dr. Wachsman.  Therefore, the plan meets the requirements of §1129(a)(10).

As stated above, given Mr. Citrin and Mr. Thurber's contention that the claims of Mr. Clay and Orbis should be recharacterized as equity or otherwise avoided, the court will determine whether Class Three accepted the plan without regard to their votes.  In the absence of their votes, the plan was accepted by five of seven noninsider creditors, or 71% of the number of creditors that voted.  *Id.* at 1.  Also, noninsider creditors holding $3,914,020.65 voted on the plan. Of that amount, Orbis holds a claim of $2,125,000 and Mr. Clay holds a claim of $416,975.48. *Id.* at 2.  This means that creditors holding claims of $1,372,045.17 voted on the plan.  All accepted the plan except for Mr. Citrin and Mr. Thurber, who together hold claims of $252,941.48.  *Id.*  Accordingly, noninsider creditors holding 82% of the amount of claims that voted on the plan accepted the plan, without regard to Mr. Clay and Orbis.  Therefore, under §1126(c), Class Three accepted the plan without regard to the votes of Mr. Clay and Orbis.

Class Four did not accept the plan and Class Four is impaired.  Therefore, the plan can be confirmed only if it meets the cramdown requirements of §1129(b).  The court addresses this below.

**Section 1129(a)(11) – Feasibility.**

Mr. Citrin and Mr. Thurber contend that the debtor did not establish that the plan is feasible.  The court disagrees.

Section 1129(a)(11) provides:

(a)  The court shall confirm a plan only if all of the following requirements are met:
******

(11) Confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan.

Section 1129(a)(11) requires a plan to be feasible.  Feasibility is a factual question for which the debtor carries the burden of persuasion.  *Pookrum v. Bank of America, N.A.*, 512 B.R. 781, 789 (D. Md. 2014).  Several Courts of Appeals have stated that success does not have to be guaranteed, but the plan should offer a reasonable assurance of success.

> Although § 1129(A)(11) does not require a plan's success to be guaranteed . . . the plan must nevertheless propose a realistic and workable framework. . . . In other words, the plan must be reasonably likely to succeed on its own terms without a need for further reorganization on the debtor's part.

*In re Am. Capital Equip. LLC,* 688 F.3d 145, 156 (3d Cir. 2012) (internal quotes and citations omitted); *see also In re Danny Thomas Prop. II Ltd. P'ship,* 241 F.3d 959, 963 (8th Cir. 2001) ("While a reorganization plan's success need not be guaranteed . . . the bankruptcy court cannot approve a plan unless it has at least a reasonable prospect for success."); *see also Kane v. Johns-Manville Corp.*, 843 F.2d 636, 649 (2d Cir. 1988) ("[T]he feasibility standard is whether the plan offers a reasonable assurance of success.  Success need not be guaranteed.").

The debtor submitted a 12-month projection that shows the debtor being able to service its obligations and remain viable.  DX 16.  The debtor was careful preparing the projections, focused on 52 weeks to make them realistic, and believes they are accurate and attainable.  The debtor also provided a seven-year projection that shows the debtor is viable, but given the state of the debtor's technology, making projections further than 12 months out becomes more speculative.

The projections establish that, with Mr. Clay's contribution of $1,960,000, the debtor will have enough resources to make all payments required under the plan.  Administrative claims will be paid, as will the creditors who accepted the 20% payout.  Thus, the feasibility of the plan with respect to creditor claims is not in doubt.

It true that it is likely that the debtor will need additional funding toward the end of the 12-month period. One of Mr. Dye's continued responsibilities will be to obtain additional funding for the debtor post-confirmation. He has raised approximately $200-$250 million for various companies. He believes the debtor will be successful in raising additional capital from Mr. Clay or other sources. One reason for this is that, by the end of the 12-month period, the debtor anticipates having a working, albeit raw, three to five kilowatt prototype of its technology that functions sufficiently to demonstrate for potential customers. The budget is adequate to achieve that goal. Certainly, as the debtor gets closer to having a prototype its ability to raise funds will be enhanced, although a functioning prototype is not necessary for additional investor funding. Indeed, Mr. Clay did not rule out providing additional funding, although he did not commit to doing so, at this time.

A further factor supporting the plan's feasibility is that the reorganized debtor will have a simple capital structure with no interest bearing liabilities having fixed repayment terms. Mr. Clay's new funds are made as a capital contribution, and the debtor has no obligation to make any payments on account of those funds.

In sum, the distinction the plan draws between the risk of feasibility to creditors and the risk to equity holders is appropriate. Creditors who chose the assurance of a 20% payment will receive that amount. Creditors who chose equity in the reorganized debtor opted to participate in the upside of a company whose technology is hopeful and potentially valuable but not assured. Under the circumstances, the plan is feasible.

**Section 1129(b)(2) – Fair and Equitable.**

Class Four, the equity interests, did not accept the plan. Therefore, the plan can be confirmed only if the debtor meets the requirements of §§1129(b)(1) and (b)(2)(C)(ii). Those provisions state, as pertinent here:

(b)(1) Notwithstanding section 510(a) of this title, if all of the applicable requirements of subsection (a) of this section other than paragraph (8) are met with respect to a plan, the court, on request of the proponent of the plan, shall confirm the plan notwithstanding the requirements of such paragraph if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.

(b)(2) For the purpose of this subsection, the condition that a plan be fair and equitable with respect to a class includes the following requirements:

******

(C) With respect to a class of interests –

******

(ii) the holder of any interest that is junior to the interests of such class will not receive or retain under the plan on account of such junior interest any property.

Starting with §1129(b)(2)(C)(ii), the debtor contends that this requirement is met because no holder of any interest that is junior to the Class Four interest holders will receive or retain any property under the plan on account of such junior interest. Mr. Citrin and Mr. Thurber do not dispute this.

However, in addition to meeting the requirements of §1129(b)(2)(C)(ii), the plan also may not "discriminate unfairly" and must be "fair and equitable" as described in §1129(b)(1). It is on this point that the parties differ. The debtor contends the plan does not unfairly discriminate and is fair and equitable because, among other reasons, all equity interests are treated the same in Class Four. All equity interests are eliminated because they have no value. Further, no one, whether existing management or equity interest holder, has been promised any recovery or interest in the reorganized debtor.

Mr. Citrin and Mr. Thurber do not dispute the foregoing, as least as it applies to the equity interests currently of record. They contend that, because the plan fails to recharacterize or avoid the Clay 2014 Loans and the $2.1 Million Converted Debt, it gives to Mr. Clay and Orbis the rights of unsecured creditors under the plan. ECF 186 at 12-13. Mr. Citrin and Mr. Thurber

contend that Mr. Clay and Orbis should only be given the rights of equity holders in light of the recharacterization and avoidance claims. *Id.*

The court concluded above that the plan is an appropriate resolution of the recharacterization and avoidance claims against Mr. Clay and Orbis, and the creditors have accepted that resolution. *See* §1123(b)(3)(A). Further, also as addressed above, Mr. Clay's additional capital contribution of $1,960,000 for no additional equity percentage renders academic Mr. Citrin and Mr. Thurber's contentions.

In addition, Mr. Citrin and Mr. Thurber have articulated no basis upon which the $2.1 Million Converted Debt could be treated below preferred equity, even if they were to be successful in their challenge. *See* §510(b) (rescission claim is subordinated to all claims or interests that are senior to or equal the claim represented by such security). If a court were to determine that the debtor's conversion of Orbis's preferred investment to debt was not an appropriate response to the Circuit Court's February 2018 ruling, the result under §510(b) almost certainly would be to give Orbis the preferred status it held under the Preferred Agreement. Thus, the debtor's equity interests would still have no value and Mr. Citrin and Mr. Thurber's claims would not provide a benefit to those interests. Therefore, the plan does not discriminate unfairly and is fair and equitable to the debtor's equity interests.

**Mr. Citrin's Offer.**

In Mr. Citrin's final objection to the plan, filed February 8, 2019, he stated he was willing to offer $2.5 million for the assets of the debtor in a chapter 7 sale, subject to various conditions. ECF 186 at 9. This was the first time any party expressed an interest in investing in or acquiring the debtor other than Mr. Clay.

On the first day of the confirmation hearing, February 19, the court engaged in a lengthy colloquy with Mr. Citrin's counsel to determine the extent of the proposal and its conditions. After discussion, the court directed the following procedure:

- Mr. Citrin would submit the offer in writing.

- The debtor pledged to provide any information or materials to him as necessary to allow him to meet the stated conditions.

- Mr. Citrin would address the proposal with the University of Maryland to determine if it would object to the debtor assuming and assigning to Mr. Citrin, or his assignee, the agreement between the debtor and the University.

- Mr. Citrin's designated representative would review the debtor's licensing agreements and patents to ensure that they are as the debtor stated.

Given the precarious nature of the debtor's financial condition, Mr. Citrin was required to obtain the information and make his assessment without delay. The court stated the case would proceed on two tracks: the confirmation hearing would go forward as would the submission and consideration of Mr. Citrin's proposal.

The proposal was addressed at various times during the four-day confirmation hearing, and at length at the conclusion of the hearing, February 26. Mr. Citrin was urged to remove conditions to his offer considering the debtor's financial condition and given that Mr. Clay was prepared to go forward with his funding of the plan (as well as to withdraw his commitment if the plan was not confirmed). Mr. Citrin's final proposal, including the remaining conditions, follows:

- He would pay $2.5 million for the debtor's assets through a plan.

- His proposal was conditioned on receiving a satisfactory resolution of the debtor's agreement with the University of Maryland.

- He required that Dr. Wachsman conduct an analysis of the debtor's technology and provide a satisfactory report to Mr. Citrin, which could not be accomplished for a month.

- He would make a subsequent capital contribution to the debtor in an amount to be determined.

- The Clay 2014 Loans and the $2.1 Million Converted Debt would be challenged for the reasons previously stated.

The debtor rejected the proposal.  It determined that the conditions presented too great of a risk to deem the proposal to be better for the creditors and the estate than the benefits provided under the plan.  The court agrees.  The reasons for the debtor's determination, which the court accepts, are fairly self-evident.

First, the debtor's financial condition does not allow for further delay in the confirmation process.  Mr. Citrin estimates his plan can be confirmed in sixty days.  The debtor lacks the ability to remain viable during that period.  Mr. Citrin states he will provide financing during the period.  This will add cost, delay, and uncertainty to the process.

Second, the resolution of the debtor's agreement with the University of Maryland presents substantial doubt about the viability of the proposal.  As stated above, the University supports the debtor's plan and has made it clear it opposes Mr. Citrin's proposal and would vigorously challenge any attempt to assume or assign its agreement over its objection.  The court required the University and the debtor to brief the issues concerning the debtor's agreement with the University, and whether it could be assumed or assigned, so the parties could assess the risk presented by that condition.  The University and Mr. Citrin filed briefs on February 27 and March 1, respectively.  ECF 226, 229.  Indeed, the University has now addressed these issues in four substantial filings:  (a) The University of Maryland's Motion to Deem Rejected the Patent License Agreement, ECF 93; (b) its reply to the debtor's opposition to that motion, ECF 149; (c) its Limited Objection to the Debtor's Chapter 11 Plan of Reorganization, ECF 176; (d) and it post-confirmation filing, ECF 226.  It raises numerous, problematic issues that would have to be

resolved under the proposal.  These issues present substantial risk that the proposal would not be consummated.

Third, the requirement that Dr. Wachsman must provide a satisfactory report on the state of the debtor's technology also is problematic.  Dr. Wachsman is a remarkably well-credentialed academic.  However, his understanding of his fiduciary duties as a member of the Board of a chapter 11 debtor leaves much to be desired.  He voted against the plan because his equity is zeroed out, and he does not have any participation in the reorganized debtor.  He felt there should be some way he could get equity in the reorganized debtor.  He noted he holds about 30% of the equity while the other members hold only around 15% each.  He felt that the debtor could eliminate a 15% interest from each member, including him, but leaving him with 15%.   He also was concerned that the debtor needed to be viable under the plan.  For that to happen, the debtor needed the "one person" (himself) who had the expertise and ability to produce a viable technology.

Dr. Wachsman would support the debtor's plan if he received equity in the reorganized debtor and participation in its management.  He attempted on two occasions to negotiate an equity interest in the reorganized debtor with Mr. Clay.  He might agree to participate in Mr. Citrin's proposal if he received sufficient equity in the venture and participation in its management.  Placing the success of the proposal with Dr. Wachsman raises at least some concern that the 30-day period would be spent negotiating his requirements for a continued investment in the venture.

   Fourth, in addition to a successful resolution of the other conditions, for creditors to receive a substantially greater benefit under Mr. Citrin's proposal, he would need to successfully challenge the Clay 2014 Loans or the $2.1 Million Converted Debt.  The debtor and Mr. Clay dispute the challenges, and have raised numerous reasons the challenges would be unsuccessful.

This presents an added level of litigation risk in assessing the proposal.

Fifth, Mr. Clay's commitment to fund the plan is conditioned on the plan being confirmed.  Mr. Citrin's proposal jeopardizes that commitment.  As the court stated to Mr. Citrin's counsel on several occasions, this situation is the proverbial "one in the hand versus two in the bush."

Finally, delay has consequences, especially in a case such as this.  Mr. Citrin's reason for waiting until the first day of confirmation to make a proposal falls flat.  He states he did not know the amount of Mr. Clay's post-confirmation capital contribution until shortly before confirmation.  Only then did he conclude he should make an offer.  But his proposal does not include the amount of his post-confirmation contribution, which is to be determined.  Therefore, the amount of Mr. Clay's contribution does not seem to have had any bearing on Mr. Citrin's proposal because that element of his proposal remains undetermined.

For the foregoing reasons, the court concludes creditors and the estate are not better off by Mr. Citrin's conditioned proposal than they are under the plan, which is determined to be confirmable and feasible.

## Conclusion

For the foregoing reasons, the court concludes that the plan should be confirmed.  A separate order will follow.

cc:    Debtor-Redox Power Systems, LLC
       Michael Lichtenstein, Esq.
       Louis Ebert, Esq.
       Richard Goldberg, Esq.
       Gregory Alan Dorsey, Esq.
       Nicole C. Kenworthy, Esq.
       Constantine Hortis, Esq.
       Paul Sweeney, Esq.
       U.S. Trustee

**END OF MEMORANDUM OF DECISION**